## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HEATHER SEIBERT,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 08-5139** |
| | : | |
| **LUTRON ELECTRONICS,** | : | |
| **Defendant** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                              **November 30, 2009**

Before the Court is a motion for summary judgment filed by Defendant, Lutron

Electronics ("Lutron"), the defendant in this case.  Plaintiff Heather Seibert, a former

employee of Lutron, has filed a claim alleging disability, gender, and pregnancy

discrimination in connection with her termination in March of 2007.  Upon careful

consideration of the parties' arguments, I will grant Lutron's motion as to all claims.

## I.    BACKGROUND[1]

Lutron is a privately owned company that specializes in the manufacture of lighting

---

[1]  Section 2(C)(4) of this Court's policies and procedures states that "[t]he papers
opposing a motion for summary judgment shall include as a separate exhibit a short and concise
statement of the material facts, which respondent contends present genuine issues for trial. This
statement should respond to the numbered paragraphs set forth in the moving party's Statement
of Undisputed Facts.  The responding party also shall set forth, in separate numbered paragraphs,
any additional facts which the respondent contends preclude summary judgment.  The Court will
accept all material facts set forth in the moving party's statement as admitted unless controverted
by the opposing party."

Ms. Seibert, in her papers opposing Lutron's motion for summary judgment, failed to set
forth numbered paragraphs responding to or corresponding with the numbered paragraphs in
Lutron's Statement of Facts.  I will not treat every fact in Lutron's Statement of Facts as
admitted, but will treat those assertions unaddressed in Ms. Seibert's Statement of Facts as
admitted.

controls. Wagner Aff. ¶ 3. It has a corporate headquarters in Coopersburg, Pennsylvania and two manufacturing and distribution centers in Brookdale and Allentown, Pennsylvania. Id. Ms. Seibert began working for Lutron in 1996 as a part-time summer employee, and became a regular full-time employee in June of 1997. Defendant's Statement of Undisputed Material Facts ("SUF"), ¶¶ 4, 5. When she began as a full-time employee, Ms. Seibert was an Associate Technical Assistant ("ATA"). Id. ¶ 5. ATA positions are entry level positions in Lutron's Technical Assistance Development Program, which is part of the larger Employee Development Program. Id. ¶¶ 6, 7. Participants in the Employee Development Program engage in "cross-training", a process of rotating in and out of various positions within Lutron, which allows them to learn and experience different aspects of Lutron's business. Id. ¶ 8.

### A. Leave Granted for Depression

Ms. Seibert generally performed well at Lutron and received promotions and raises; however, as early as 1999 and at other times during her first few years of employment, she received warnings about her failure to attend work on a regular basis. SUF, ¶¶ 9, 10; Wagner Affidavit, ¶ 11; Seibert Dep. 53:17–20. Beginning in 2005, Ms. Seibert began to experience symptoms of depression. Seibert Dep. 90:16–20, 91:4–11. She began to miss work more frequently, with four absences in January of 2005 and eleven in April of 2005. Wagner Affidavit, ¶ 14. In May of 2005, Ms. Seibert requested a leave of absence for her depression, which Lutron granted. SUF ¶ 17, Seibert Dep. at

90:21–25.

Ms. Seibert's depression was caused by, among other things, her fiance's alcohol consumption, the stress of planning her wedding, financial problems, and her grandfather's illness. Seibert Dep. at 99:2–12. To treat her depression, Ms. Seibert attended counseling with Kim Bonner, a social worker, and began taking Zoloft and Ambien. Id. at 91:16–21; 101:21–25. She returned to work on October 6, 2005. Id. 98:17–19. After her return, Ms. Seibert reported to her therapist that she was adjusting well to work and was not experiencing continued symptoms of depression. Id. 99:13–22. On the ADA questionnaire she submitted in connection with her discrimination claim, Ms. Seibert described her depression symptoms as "temporary." Def.'s Mot. For Summ. J., Ex K.

Ms. Seibert continued to miss work following her return to Lutron in October of 2005. Seibert Dep. 103:22–25. Some of these absences were unrelated to her depression. Id. 105:2–8. In January of 2006, Ms. Seibert's physician, Dr. Liaw, submitted FMLA-mandated notice to Lutron that Ms. Seibert continued to suffer from episodes of depression and that the probable duration of her symptoms was "unknown." Def.'s Mot. For Summ. J, Ex. C. Dr. Liaw stated that Ms. Seibert could be absent "2 or 3 days once a month" due to her periodic symptoms. Id. He also represented that she was receiving medication and undergoing counseling and that she would "intermittently" require medical leave because of her condition. Id. During the seven month period from January

3

of 2006 until July of 2006, Ms. Seibert missed 70 days of work, an average of ten days per month. Wagner Aff. ¶ 18; Seibert Dep. 123:12–15.

**B.     Maternity Leave Granted**

In July of 2006, Ms. Seibert requested and was granted a maternity leave of absence. Seibert Dep. 123: 16–18. She began maternity leave on July 25, 2006 and, after delivering twins, returned to work on October 2, 2006 without any restrictions. Id. 123:22–25; 124:2–4, 24–25. While she was on maternity leave, Ms. Seibert was informed by Richard Wagner, a Human Resources representative at Lutron, that she had exhausted her Family and Medical Leave Act leave time and would not be eligible for more until she had worked the requisite number of hours. Wagner Dep. ¶ 20. When Ms. Seibert returned to Lutron on October 2, she had a meeting with Mr. Wagner where they discussed the importance of her regular attendance and where Ms. Seibert expressed that she "appreciated how Lutron had accommodated her frequent absences." Id. ¶ 20. At that meeting, Ms. Seibert signed a document entitled "Conditions of Heather Seibert's Return to Work—October 2, 2006" that reiterated the importance of her regular attendance and stated specifically:

> "Now that you have been released to return to work you must understand that the company can no longer accept the past situation of poor attendance. We need you to be working in your position on every scheduled workday. If you are not able to be here on your scheduled workdays, and meet the expected level of performance for your position, then we will need to terminate your employment."

Def.'s Mot. For Summ. J., Ex. F.

4

### C.    Work Record Upon Return

Prior to her maternity leave, Ms. Seibert was a documentation specialist.  SUF ¶ 29.  Upon her return from leave, she rotated into a position as an inventory control specialist at Lutron's facility in Brookdale and was asked to train Matt Hoffman, another participant in the Employee Development Program, in the documentation specialist position.  Id. ¶ 31.  There was no change in Ms. Seibert's title or compensation as a result of her rotation.  Id. ¶¶ 29–30.  Mr. Hoffman was later asked to train another Program participant in the documentation specialist position before he moved on to a different position.  Id. ¶ 32.

Following her return, Ms. Seibert continued her string of absences, missing half or full days on October 18, November 15, November 20, November 27, and December 19, 2006.  See SUF ¶¶ 47–49.  Between January and March of 2007, she missed seven full days and three half days of work.  Id. ¶ 50.  According to Ms. Seibert, all of these absences, with the exception of three, were needed to take her children to appointments or to provide them childcare.  Seibert Dep. 137:14–25.  These absences were unrelated to her depression.  Id. 138:8–16.  When she was absent during this period, she marked the missed days as "vacation days."  She explained that "I was told I needed to use my vacation time if I was going to be out."  Id. 166:1–8.  Ms. Seibert did not provide advance notice of her absence on these missed days.  Wager Aff. ¶¶ 26, 36, 37.

On March 23, 2007, Ms. Seibert met with her immediate supervisor, Scott Reinert

and Mr. Wagner to discuss her most recent performance review, which indicated that Ms. Seibert's absences had caused a strain on her department and had prevented her from gaining the necessary training and experience in her position.  Wagner Aff. ¶¶ 38–39.  They informed Ms. Seibert that, as a result of her absences, she would be terminated or given an opportunity to resign from her position.  Id. ¶ 39.  Ms. Seibert chose to resign.  Id.

**D.    The Current Action**

Ms. Seibert sent a Charge of Discrimination to the Equal Employment Opportunity Commission ("EEOC") on July 24, 2007, dual filing with the Pennsylvania Human Relations Commission ("PHRC") on July 26, 2007.  In her charge, she alleged discrimination based on sex and disability.  Def.'s Mot. For Summ. J., Ex K.  Her ADA intake questionnaire describes her disabilities as follows: "I experienced depression.  I was unable to get out of bed and do anything.  I would not leave the house.  I was in a high risk pregnancy.  I had morning sickness throughout the entire pregnancy.  I delivered twins two months early."  Id. Ex. L.  She also described her disabilities as "temporary."  Id.  Ms. Seibert received a Notice of Right to Sue on March 31, 2008.  Id.  She filed a Complaint in the Court of Common Pleas of Lehigh County on October 8, 2008, and Lutron removed to this Court on October 28, 2008.  In her complaint, Ms. Seibert alleges that Lutron violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) *et seq*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*, the Pennsylvania

6

Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq*, and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k).


## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it could affect the outcome of the case under the governing law. Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R.

CIV. P. 56(e). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing "based on the affidavits or by depositions and admissions on file" that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir.1992).

The court must view the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's version of events against the opponent, even if the quantity of the moving party's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).


III.    DISCUSSION

This Court has jurisdiction over Ms. Seibert's ADA, Title VII, and PDA claims pursuant to 28 U.S.C. § 1331 and it has jurisdiction over her PHRA claims pursuant to 28 U.S.C. § 1367. Ms. Seibert's PHRA discrimination claims will be analyzed co-extensively with her federal claims. See Castellani v. Bucks County Municipality, 2009

WL 3748548 at *2 (3d Cir. November 10, 2009) (citing <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 105 (3d Cir.1996)).

### A.  The Burden-Shifting Framework

Ms. Seibert's claims are governed by the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  This framework applies to both Title VII gender and pregnancy discrimination claims and to disability discrimination claims.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Williams v. Philadelphia Hous. Auth. Police Dept.</u>, 380 F.3d 751, 759–60, n. 3 (3d Cir. 2004). Pursuant to this framework, Ms. Seibert bears the "ultimate burden" of showing that Lutron intentionally discriminated against her.  <u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).  To meet this burden, she must first set forth a prima facie case of discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Burdine</u>, 450 U.S. at 253–54. The burden then shifts to Lutron to provide evidence showing that it had a legitimate, non-discriminatory reason for asking Ms. Seibert to resign her position.  <u>McDonnell Douglas</u> 411 U.S. at 802.  "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  <u>Burdine</u>, 450 U.S. at 254.  If Lutron sets forth a legitimate non-discriminatory reason, the burden shifts back to Ms. Seibert to show, by a preponderance of the evidence, that this reason was pretextual. <u>McDonnell Douglas</u>, 411 U.S. at 804.  "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

<u>Burdine</u>, 450 U.S. at 256.

**B. Ms. Seibert's Disability Discrimination Claim**

Lutron claims that Ms. Seibert cannot establish a prima facie case of disability

discrimination because her temporary depression does not render her disabled within the

meaning of the ADA. To establish a prima facie case of disability employment

discrimination, Ms. Seibert must demonstrate that (a) she is a disabled person within the

meaning of the ADA; (b) she is otherwise qualified[2] to perform the essential functions of

the job, with or without reasonable accommodations by her employer; and (c) she has

suffered an otherwise adverse employment decision as a result of discrimination. <u>Shaner</u>

<u>v. Synthes (USA)</u>, 204 F.3d 494, 500 (3d Cir. 2000); <u>see</u> <u>Gaul v. Lucent Techs., Inc.</u>, 134

F.3d 576, 580 (3d Cir. 1998).

**1. Does Ms. Seibert Have a Disablity Within the Meaning of the ADA and PHRA?**

A disability is (a) a physical or mental impairment that substantially limits one or

more of the major life activities of an individual; (b) a record of such impairment; or (c)

being regarded as having such an impairment. <u>See</u> 42 U.S.C. § 12102(2). A physical or

mental impairment includes any mental or psychological disorder, such as mental

retardation, organic brain syndrome, emotional or mental illness, and specific learning

disabilities. 29 C.F.R. § 1630.2(h). To be substantially limited in a major life activity,

_____

[2] Under the ADA, a qualified individual with a disability is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . ." <u>See</u> 42 U.S.C. § 12111(8).

the plaintiff must be (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which he or she can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1); Emory v. AstraZeneca Pharm., LP, 401 F.3d 174, 180 (3d Cir. 2005).

Several factors must be considered in evaluating whether an individual is disabled due to substantial limitations in a major life activity. These factors are: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2); Williams, 380 F.3d at 763. A temporary, transient, or nonpermanent impairment is not a disability that substantially limits a major life activity. See McDonald v. Commonwealth, 62 F.3d 92, 94–97 (3d Cir.1995); Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002). The "nature and severity" of Ms. Seibert's impairment and its "duration or expected duration," along with the "permanent or long term impact" of that impairment, are factors to be considered in determining whether an individual is substantially limited in a major life activity. 29 C.F.R. § 1630.2(j)(2); Williams, 380 F.3d at 765. However, the ADA requires those "claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198 (2002).

In her complaint, Ms. Seibert claims she suffers from depression and that this mental impairment substantially limits her ability to concentrate, interact with others, perform manual tasks, sleep, and work. See Complaint, ¶¶ 36–40. However, in her response to Lutron's motion for summary judgment, Ms. Seibert refers only to "problems . . . reporting to work on a daily basis." Pl.'s Mem. Of Law in Opp'n to Def.'s Mot. For Summ. J., 14.[3]

Ms. Seibert has not produced sufficient evidence to establish that her depression is permanent or has long term impact, or that it substantially limits any major life activities. It is clear that Ms. Seibert experienced a period of depression from approximately April of 2005 until October of 2005. Seibert Dep. 90:16–20, 91:4–11. As a result of her condition, she requested and was granted a leave of absence during this time. See id. 90–91. In her July 2007 ADA intake questionnaire, she states of her depression and her pregnancy that "both conditions were temporary." Def.'s Mot. For Summ. J., Ex K, "ADA Intake Questionnaire," 1.

After returning to work in October of 2005, Ms. Seibert continued to experience frequent absences, and in January of 2005, her family practitioner, Dr. Liaw, submitted a FMLA form indicating that Ms. Seibert continued to suffer from "intermittent episodes of depression" during which it was "impossible to work" and wrote that she would miss two

---

[3] The Court notes that Ms. Seibert's Response to the Defendant's Motion for Summary Judgment, in addition to exceeding the Court's 25 page limit by over ten pages, contains no page numbering; any pages cited are based on the Court's manual calculation.

to three days of work per month for an indeterminate period of time.  Def.'s Mot. For Summ. J., Ex C.  However, Kim Bronner, a licensed clinical social worker and Ms. Seibert's treating mental health care professional, submitted no such form.  Seibert Dep. 91:20–24.  Dr. Liaw did not state in any detail the treatment regimen Ms. Seibert was undergoing under the care of Ms. Bronner; he simply wrote the words "medication" and "counseling."  See id.  Although Ms. Seibert contends in her Statement of Facts that she missed approximately twelve days of work per month between January and July of 2006, because of "severe depression" she provides no evidence to support this assertion.  Pl.'s Statement of Undisputed Material Facts, ¶ 22.  Ms. Seibert has provided no records, affidavits, or deposition testimony claiming that her symptoms were severe enough to merit her excessive absences after her return to work in October of 2006 or explaining the discrepancy between the two to three days of work per month Dr. Liaw stated she would miss and the approximately twelve days per month she did in fact miss.

Ms. Seibert admitted in her deposition that her depression was situational in that it was based on various stressful circumstances in her life existing at the time it began—her fiance's increased alcohol consumption, the stress of planning a wedding, financial problems she was having, and her grandfather's illness.  Seibert Dep. 94–99.  In answering whether her depression was "essentially from April 2005 to October 2005", Ms. Seibert responded, "[t]he initial depression, yes."  Id. at 100:10–13.  She has provided no evidence that her depression continued after her return to work in October of 2005, beyond the letter provided by Dr. Liaw, which explains only a portion of the days

missed after this return.

Even were the Court to assume that Ms. Seibert's period of excessive absence from January 2006 until July 2006 was the result of her depression, there is no evidence that she continued to suffer from depression during or after her pregnancy leave, which began in July of 2006. She stopped taking anti-depressants in February of 2006 and stopped seeing her therapist in June of 2006; she has not resumed either a medication regimen or counseling since these respective dates. Seibert Dep. 101: 10–12; 102: 14–25. Ms. Seibert admitted that when she returned to work in October of 2006 until she was asked to resign in March of 2007, all of her absences were because of childcare issues with the exception of three, which were due to sinusitis. Seibert Dep. 137: 7–25.

In sum, Ms. Seibert has demonstrated that she suffered from depression from May until October of 2005. Only viewing the facts in the light most favorable to her should the Court find that she has presented evidence sufficient to show that her depression caused her excessive absences from January until July of 2006. She has failed to provide any evidence that she suffered from depression or received treatment for it at any time after July of 2006. Her condition was temporary, and thus is not a disability as defined under the ADA.[4] I will therefore grant Lutron's motion for summary judgment as to Ms.

---

[4] Ms. Seibert requests in her response to Lutron's motion that her disability discrimination claim be evaluated under the ADA Amendment Act ("ADAAA"), which significantly alters how courts evaluate ADA claims and broadens the scope of ADA protections. See Pub. L. No. 110-325. The act is effective January 1, 2009. Id. Ms. Seibert does not clarify which aspect of the amendments would alter the outcome of her claim. In any case, it is now settled that courts must not retroactively apply legislation if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with

Seibert's disability discrimination claim.[5]

## 2. Is Ms. Seibert Regarded As Having an Impairment

In her response to Lutron's summary judgment motion, Ms. Seibert contends that, in addition to being disabled, she was perceived as disabled by Lutron. Lutron claims Ms. Seibert's regarded-as claim must be dismissed because she failed to raise it in her EEOC filings and therefore has not exhausted her administrative remedies as to this claim.

A person is regarded as having a disability within the meaning of the ADA when either "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999) (overruled on other grounds).[6]

---

respect to transactions already completed." Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994). Courts in this Circuit have relied on Landgraf in refusing to apply the ADAAA to actions pending before the January 1, 2009 effective date. See Parker v. Midwest Air Traffic Control, 2009 WL 1357238 at *4 (W.D. Pa. May 12, 2009); Lekich v. Municipal Police Officers Educational Training Com'n, 2009 WL 513260 at *n 3 (E.D. Pa. Feb. 26, 2009). Because the allegedly discriminatory acts in this case took place prior to January 1, 2009, this Court has accordingly applied the provisions of ADA as they existed prior to passage of the ADAAA.

    [5] The Court notes that, had Ms. Seibert presented the proper (or any) evidence in support of her claims, such evidence could conceivably have been sufficient for a finding that Ms. Seibert is disabled due to intermittent episodes of depression. However, her disability discrimination claim would still fail, because there is absolutely no evidence that Lutron's professed reason for her termination—her excessive absenteeism—was pretextual.

    [6] The ADAAA, which overruled Sutton, was not in effect at the time of the events surrounding Ms. Seibert's cause of action. See Note 4.

Before filing a civil suit, a plaintiff alleging disability discrimination must first exhaust her administrative remedies by filing a charge of discrimination with the EEOC. Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984). The Third Circuit has held that "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Atkinson v. Lafayette College, 460 F.3d 447, 453 (3d Cir.2006) (quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398–99 (3d Cir.1976)).

Whether a plaintiff has failed to exhaust her administrative remedies as to one type of disability discrimination claim, such as a regarded-as claim or a failure to accommodate claim, will be determined by looking to the facts alleged in the complaint and determining which charges may reasonably be expected to grow therefrom. See Acker v. Coca-Cola North Am., 2007 WL 2955595 at *5 (E.D. Pa. Oct. 9, 2007) (finding that the plaintiff's allegations that employer discriminated by denying him overtime were not exhausted because they were not contained in either "the charge Plaintiff filed with the EEOC nor Plaintiff's Response to the EEOC questionnaire"); Manson v. North Carolina A & T State Univ., 2008 WL 2987071 at *6 (M.D. N.C. July 31, 2008) (finding exhaustion of administrative remedies as to the plaintiff's cause of action for regarded-as discrimination but failure of exhaustion for failure to accommodate claim since it was not specifically raised); Mayers v. Washington Adventist Hosp., 131 F. Supp. 2d 743, 748 (D. Md. 2001).

The EEOC ADA intake questionnaire Ms. Seibert completed asks the following:

"If you are claiming that you are not disabled, but Respondent incorrectly perceived you to have a disability, describe what disability you are perceived as having." Def.'s Mot. For Summ. J., Ex K. The suggestive phrasing of this question might lead a layperson to assume that claims of being disabled and being regarded as disabled are mutually exclusive. This is not the case. See Taylor v. Pathmark Stores, 177 F.3d 180, 189 (3d Cir. 1999) ("a plaintiff may plead in the alternative, and our caselaw finds no difficulty with pairing the two claims in one complaint").

Therefore, had Ms. Seibert answered this question in the negative, but asserted facts within her EEOC charge supporting a regarded-as claim, she might have grounds for assertion of a regarded-as claim in this cause of action. The factual allegations contained in an EEOC charge must, at least, support whatever claim the plaintiff alleges is encompassed in the EEOC filings. See Acker, 2007 WL 2955595 at *5 (citing Atkinson, 460 F.3d at 453). The facts alleged in Ms. Seibert's EEOC filings could not reasonably be expected to support the claim that she was wrongly perceived as disabled. She claimed in her EEOC charge that "she was informed that her old job was going to be phased out because Respondent had found other means of doing her job"; not that she was moved from her job because she was considered unable to adequately perform. She acknowledges in her EEOC complaint that she was terminated for missing too many days of work; not that she was wrongly deemed unable, physically or mentally, to handle her job responsibilities. Ms. Seibert admitted as much in her deposition, where she once again stated that Lutron did not perceive her to be disabled where she was not. Seibert

Dep. 174:12–15.

Because Ms. Seibert has failed to exhaust her administrative remedies as to her "regarded as" disability discrimination claim, I will grant Lutron's motion for summary judgment as to this part of her claim.[7]

### C.  Ms. Seibert's Title VII Discrimination Claims

Title VII, which prohibits employment discrimination on the basis of sex, was amended in 1978 by the Pregnancy Discrimination Act ("PDA"), which equates discrimination based on pregnancy and related conditions with discrimination on the basis of sex.  See 42 U.S.C. § 2000e(k).  In both gender and pregnancy discrimination cases, the now familiar McDonnell Douglas burden shifting framework applies.

#### 1.  Gender Discrimination

To establish a prima facie case of gender discrimination under Title VII, the plaintiff must show that she: (1) was a member of the protected class; (2) was qualified for the job; and (3) suffered an adverse employment decision under circumstances that give rise to an inference of unlawful discrimination. See Tx. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Ms. Seibert's gender discrimination claim appears to be that she suffered the adverse employment decision of having her job re-assigned following her return from

---

[7]  Even if Ms. Seibert had exhausted her administrative remedies with respect to her regarded-as claim, the evidence supports a finding that Lutron's motion should be granted.  Ms. Seibert has set forth no evidence showing that Lutron either believed she had a substantially limiting impairment that she did not have or that it believed her impairment was more limiting that it actually was.  See Sutton, 527 U.S. at 489.

maternity leave. Again, Ms. Seibert points to no specific evidence or references in the record in support of this claim, asserting only that "Defendant clearly was upset that Seibert had missed so much work due to pregnancy and other health issues. They determined it would be better to replace her with a man so as to avoid continuation of these problems." Ms. Seibert has presented no evidence that she suffered an adverse employment action because of her gender or that she was replaced by a man following her maternity leave.

During her time at Lutron, Ms. Seibert "cross-trained" by working in numerous different positions for various periods of time as a participant in Lutron's Employee Development Program. See Seibert Dep. 45–49. Prior to taking her maternity leave, Ms. Seibert worked as a documentation specialist as part of her cross-training at Lutron. Id. 63: 10–25. She started that position on her own, and then was joined by Angela Weaver, another employee engaged in Lutron's cross-training program. Id. During the time Ms. Seibert was on leave, Ms. Weaver worked in the position of documentation specialist alone. Id. 65:8–10. After Ms. Seibert returned from maternity leave in October of 2006, Matt Hoffman, another participant in Lutron's employee development program, rotated into the position of documentation specialist and Ms. Seibert assisted in training him at that position. Id. 65:16–25; Wagner Aff. ¶ 31. Ms. Seibert then rotated out of the documentation specialist position and into an inventory control cycle counting position, a position at the same level as her previous one and which offered the same compensation. See id. 65, 66. Ms. Seibert admitted this move was part of her ongoing cross-training. Id.

19

67:5–10.  Later in her deposition, Ms. Seibert reiterated the claim that her old job had been "phased out" and Lutron had found "other means" to do it.  Her response to Lutron's motion points to no evidence in support of this assertion.

Ms. Seibert, therefore, has failed to establish that she suffered an adverse employment action when she was moved from her documentation specialist position to her inventory control position.  A transfer can, in some instances, qualify as an adverse employment action.  See Torre v. Casio, 42 F.3d 825, 831 n.7 (3d Cir. 1994).  However, Ms. Seibert has the burden of showing that the transfer was adverse, by pointing to evidence that it "denied [her] of [an] employment opportunity or altered . . . employment rights."  Boykins v. Lucent Technologies, Inc. 78 F. Supp. 2d 402, 415 (E.D. Pa. 2000).  This Ms. Seibert has failed to do.  Ms. Seibert admitted in her deposition that the position into which she rotated was at the same level and offered the same compensation as her previous one, and did not submit any evidence to show that it in any way altered her employment opportunities or rights with Lutron.  Because she has failed to show that her transfer was an adverse employment action, Ms. Seibert has not met her burden of setting forth a prima facie case of gender discrimination.

Even assuming for the sake of argument that Ms. Seibert showed she suffered an adverse employment action, she failed to present any evidence showing that Lutron's explanation for her move and the subsequent training of Matt Hoffman—that it was a normal part of the cross-training component of Lutron's employee development program—was pretext for discrimination.  Therefore, I will grant Lutron's motion for

summary judgment as to Ms. Seibert's gender discrimination claim.

## 2. Pregnancy Discrimination

To establish a prima facie case of pregnancy discrimination, the Third Circuit requires that the plaintiff show (1) that the employer had knowledge of the plaintiff employee's pregnancy; (2) that the plaintiff was qualified for the job; (3) that she suffered an adverse employment action; and (4) that there is some nexus between her pregnancy and the adverse employment action.  Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 365 (3d Cir. 2008).  Title VII's prohibition on gender discrimination is breached "whenever an employee's pregnancy [or related medical condition] is a motivating factor for the employer's adverse employment decision." In re: Carnegie Ctr. Assoc., 129 F.3d 290, 294 (3d Cir.1997).  "The PDA does not, however, require preferential treatment for pregnant employees. Instead, it mandates that employers treat pregnant employees the same as non-pregnant employees who are similarly situated with respect to their ability to work."  C.A.R.S. Protection Plus 527 F.3d at 364.

In her complaint, Ms. Seibert claimed that due to severe morning sickness, she was unable to get out of bed or otherwise attend work on a regular basis and that due to the high-risk nature of her pregnancy, she would need to attend numerous doctors' appointments.  Compl. ¶¶ 59–62.  She claims she requested an accommodation by asking for a place to lie down and rest during the day and that Lutron ignored these requests.  Id. ¶ 62–64.  Ms. Seibert does not address this claim in her response to Lutron's motion for summary judgment, instead asserting a new and different pregnancy discrimination claim

21

that will be addressed below.

I will grant Lutron's motion for summary judgment as to the pregnancy discrimination claim set forth in her Complaint. Ms. Seibert's allegation—that Lutron ignored her request for an accommodation in the form of a reclining chair—is not set forth in her EEOC charge and would not be timely if it had. As discussed previously, a plaintiff must file a charge alleging discrimination in violation of Title VII with either the EEOC or PHRC before filing suit in federal court. See 29 U.S.C. § 626(d). In Pennsylvania, a plaintiff must file with the EEOC or PHRC within 300 days of the allegedly discriminatory action in order to preserve her claim. Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir.2000). Unless grounds for equitable tolling exist, "discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." Nat'l RR Passenger Corp. v. Morgan, 536 U.S. 101, 113.

Ms. Seibert's EEOC charge contains no specific mention of her request for a reclining chair during her pregnancy. See Def.'s Mot. for Summ. J. Ex. K. It states in response to a question concerning her supervisors' awareness of her disability that, "I told them in person that I was pregnant with a high risk pregnancy and that I would be having many Doctors' appointments. They really didn't have any accommodations for me when I was at work and not feeling well." Id. Because her specific request for a reclining chair is not mentioned in her EEOC complaint, Ms. Seibert is barred from asserting it here. Even were the Court to read her complaint liberally to assume inclusion of this claim, it

would still fail.  Ms. Seibert stated that she made this request prior to her maternity leave, which began on July 25, 2006.  Seibert Dep. 170:22–24.  Assuming that Lutron ignored her request from the time she made it until she left on maternity leave, the last possible date on which to begin calculating Ms. Seibert's 300 day EEOC filing period is July 25, 2006.  Ms. Seibert filed her first and only EEOC discrimination charge on July 20, 2007, 60 days after the last date on which she could have filed a charge based on this pregnancy discrimination claim.  Therefore, this claim is time-barred and should be dismissed.

In her response to Lutron's motion for summary judgment, Ms. Seibert sets forth a different pregnancy discrimination claim, alleging she has set forth a cause of action "given the way she was singled out and forced to use her vacation time simply because she was having post natal problems with her twins."  Pl.'s Mem. In Opposition to the Def.'s Mot. for Summ. J. at 32.  It is difficult to decipher, based on this language, the exact nature of Ms. Seibert's claim.  In any case, Ms. Seibert has not alleged that she suffered from continuing health problems in connection with her pregnancy and the language of the PDA, which prohibits discrimination based on pregnancy and related medical conditions, simply cannot be interpreted to encompass childcare duties following pregnancy.  Therefore, the conditions that caused Ms. Seibert's absences following maternity leave are not covered under the PDA.

Finally, Ms. Seibert's claim—that she was "singled out and forced to use her vacation time"—is not supported with any evidence or testimony from other employees.

In her deposition, Ms. Seibert admitted that she had no personal knowledge of Lutron's permitting other employees to take unplanned days off from work and mark them as vacation days. Seibert Dep. 168:1–14. She acknowledged that she was treated in accordance with Lutron's attendance policy and failed to describe with any particularity how she was treated differently from any other employee. Therefore, I will grant Lutron's motion for summary judgment with respect to Mr. Seibert's pregnancy discrimination claim.

## IV.     CONCLUSION

For the foregoing reasons, I will grant Lutron's motion for summary judgment as to Ms. Seibert's disability, gender, and pregnancy discrimination claims and dismiss her cause of action in its entirety. An appropriate order follows.